606 So.2d 885 (1992)
James Russell COLLIER, Plaintiff-Appellant,
v.
SOUTHERN BUILDERS, INC. and CNA Insurance Company, Defendant-Appellee.
No. 23991-CA.
Court of Appeal of Louisiana, Second Circuit.
September 23, 1992.
*887 Richard M. Upton, Baton Rouge, for plaintiff-appellant.
Mayer, Smith & Roberts by Steven E. Soileau, Shreveport, for defendant-appellee.
Before MARVIN, NORRIS and BROWN, JJ.
NORRIS, Judge.
In January 1990, James R. Collier sued his former employer, Southern Builders Inc. and its workers compensation insurer, CNA Insurance Co., for supplemental earnings benefits ("SEB"), medical expenses, penalties and attorney fees arising from an injury he suffered at work in December 1987. After trial, the court sustained defendants' exception of prescription and dismissed Collier's suit. Collier now appeals that judgment. For the reasons expressed, we reverse and remand.

FACTS
Collier, a carpenter, injured his left elbow while working for Southern Builders Inc. on December 9, 1987. That morning he and a co-worker were building forms for a crash wall on 1-49 in Shreveport. Collier's co-worker left the site with the approval of the crew supervisor. Although Collier told the supervisor that the form was too heavy for one man to handle, the supervisor told him to proceed with the work because of time and scheduling constraints. As Collier lifted the form, he felt a "pop" in his left arm around the elbow; he testified that the injury was very painful. R.p. 74.
Collier's supervisor sent him to Dr. Price, the company doctor. Dr. Price told Collier that he had probably "pulled something"; he placed Collier's arm in a sling and released him with a slip which prescribed "no duties" for him at work.
Collier testified that he spent the next two to three weeks sitting around the office, as he was unable to work. Dr. Price then released him for "light duties." Collier testified that during this time he occasionally ran errands for the company.
In January 1988, the company laid Collier off due to lack of available work. Collier got the necessary licenses and began working on his own. He testified that he was able to find enough work for himself, but because of continued problems with his arm, he was forced to hire an assistant, which substantially cut his net income.
Early in 1988, Dr. Price referred Collier to Dr. Edward Anglin, an orthopedic surgeon. Dr. Anglin's diagnosis in February 1988 was "point tenderness over the lateral epicondyle," or tennis elbow. Anglin Deposition p. 3. He prescribed anti-inflammatory drugs to alleviate the problem. There is no mention of disability in Dr. Anglin's case notes for either this or a later visit in March 1988.
On April 19, 1988, Collier saw Dr. David Adams at Dr. Anglin's suggestion. Dr. Adams's tests revealed "localized neuropathy of left ulnar nerve across elbow." Id., 7. From these findings Dr. Anglin diagnosed "ulnar nerve entrapment," a "progressive-type injury" different from the earlier diagnosis of tennis elbow. Id., 8. Dr. Anglin stated that both tennis elbow and ulnar nerve entrapment were consistent with the trauma to Collier's elbow caused by his accident at work. Id., 27.
Collier testified that Dr. Anglin told him within a few weeks that Dr. Adams's tests revealed an ulnar nerve problem which might need surgery in the future. R.p. 112. However, Collier continued working as a carpenter on his own or with an assistant until April 1989. He testified that his elbow became worse during the late winter and early spring of 1989. He experienced significantly greater pain, numbness in his arm and hand, and began to lose his grip in the left hand. He went back to Dr. Anglin in May 1989 because his arm had begun to "hurt all the time." R.p. 88. He testified *888 that Dr. Anglin told him at this visit that he needed surgery soon or he would risk losing the use of his hand. R.p. 91. Dr. Anglin stated that surgery was indeed necessary by May 1989, and that he considered Collier disabled from performing carpenter's work at that time. Anglin Dep., 11, 17, 18.
Dr. Anglin performed surgery to release the ulnar nerve in June 1989. After the initial recovery period, Collier noticed some improvement, but was experiencing "intermittent severe pain" by the time of his follow-up visit in September 1989. Id., 13. Collier testified at trial in July 1991 that he still experienced considerable pain and that his elbow hurt even after relatively short periods of driving a car. After the surgery, Dr. Anglin referred Collier to Dr. Richard Ioppolo in Baton Rouge, as Collier had moved there. Both Dr. Anglin and Dr. Iopollo stated that Collier could not return to carpentry work as long as these symptoms continued.
Collier submitted his claim to the Office of Workers Compensation in October 1989. When the claim was not resolved satisfactorily, Collier filed suit on January 26, 1990. Defendants filed an exception of prescription, urging that Collier was aware of the extent of his injuries no later than April 1988, when he learned the results of Dr. Adams's tests; as suit was filed more than one year from this date, Collier's claim was prescribed. The exception was referred to the merits.
After trial in July 1991, the court rendered judgment awarding Collier certain medical expenses which are uncontested on appeal, but sustaining defendants' exception as to the claim for SEB. On appeal, Collier urges in a single assignment that the trial court erred in finding that his claim had prescribed as a matter of law.

DISCUSSION
Ordinarily, a claim for workers compensation must be filed within one year of the accident. La.R.S. 23:1209. If, however, "the injury does not result at the time of, or develop immediately after the accident, the limitation shall not take effect until one year from the time the injury develops[.]" All actions are limited by a two year period from the date of the accident.
The Louisiana Supreme Court has held that an injury does not develop until it prevents the employee from pursuing his employment. Mottet v. Libbey-Owens-Ford Glass Co., 220 La. 653, 57 So.2d 218 (1952); Loud v. Dixie Metal Co., 475 So.2d 122 (La.App.2d Cir.1985), and citations therein; Ponville v. Travelers Ins. Co., 591 So.2d 421 (La.App. 5th Cir.1991), writ denied 592 So.2d 1336 (1992), and citations therein.
Collier claims that his injury developed within the meaning of the statute when Dr. Anglin told him on May 12, 1989 that he was disabled from working as a carpenter and required imminent surgery. However, the trial court found as fact that Collier was "aware of the significance" of his injury "as early as April 19, 1988, or shortly thereafter" when he learned the results of Dr. Adams's tests. R.p. 39.
A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of manifest error or unless it is clearly wrong. Nevertheless, when the court of appeal finds that a reversible error of law or manifest error of material fact was made in the trial court, it is required to determine the facts de novo from the entire record and render a judgment on the merits. Rosell v. ESCO, 549 So.2d 840 (La.1989).
Did Collier understand the significance of his injury in the late spring of 1988? The record does not, as defendants suggest, show that Dr. Adams told Collier either the results or significance of the tests run in April 1988. Dr. Anglin stated that he phoned Collier shortly after the test and told him what the problem was, but he advised Collier to "wait on this to see how you're going to do." Anglin Dep., 29. Because ulnar nerve injuries may improve with time, Dr. Anglin's practice is to wait and exhaust conservative measures; if the injury "gets progressively worse," the next step is surgery. Id., 30. This was the information given to Collier in the spring of *889 1988; no mention was made of disability at this time, and surgery was not imminent. In fact, Collier continued to work as a carpenter for nearly a full year after he and Dr. Anglin discussed the results of his tests. Collier's uncontradicted testimony establishes that his injury developed into disability in the spring of 1989, when the pain became debilitating and additional symptoms of numbness and loss of control in the hand appeared. It was in April 1989 that Collier finally gave up his work as a carpenter and found employment in another field, and May before he learned that surgery was inevitable. The testimony of both Collier and Dr. Anglin is irreconcilable with the trial court's finding that Collier understood the ramifications of his injury in 1988.
The trial court relied on Melancon v. Hartford Ins. Co., 545 So.2d 557 (La.App. 4th Cir.), writ not cons. 548 So.2d 1221 (1989), which held that where an employee knows of an injury at the time of the occurrence and is aware that he has a valid compensation claim, later medical diagnosis of disability alone does not cause prescription to start anew. Melancon injured his back several times at work, the last occurrence being on or before February 9, 1983; he filed his claim on February 21, 1985. He argued that his injury did not develop until January 1985, when medical examination revealed disc abnormality and surgery was recommended. The court rejected this theory, noting that Melancon's symptoms were not due to the trauma of an accident at work but "were the result of a degenerative back disease." See Melancon v. Lone Star Industries, 503 So.2d 631, 632 (La. App. 4th Cir.), writ denied 503 So.2d 1017 (1987). The court further reasoned that, even if Melancon's injury had not manifested itself until January 1985, his claim was nevertheless prescribed because it was not brought within two years of the date of the accident as required by R.S. 23:1209. Melancon then sued his attorney for malpractice. The trial court sustained the defendant's motion for summary judgment, finding that Melancon was aware of his injury at the time of the accident and his claim had thus already prescribed when he hired his attorney 21 months after the accident. On appeal, Melancon again urged that since he had a developmental injury his action did not prescribe until February 1985, after he had retained counsel but before the suit was filed. Affirming the trial court's decision, the Fourth Circuit cited medical testimony to the effect that Melancon's injury manifested itself as early as 1980. The court reasoned that the injury had "developed" long before surgery was recommended, and stated that disability
marks the time from which it is clear that the employee is no longer able to perform the the duties of his employment in a satisfactory manner. * * * Development, further, connotes the time when the disability to perform work becomes manifest to the injured employee or the employer. 545 So.2d at 559, citations omitted.
The court then noted that Melancon's "own testimony uncontrovertedly established ... that his injury prevented him from performing his duties." Id. at 559.
The facts of Melancon are thus at odds with those of the instant case; Collier was able to continue working as a carpenter after his injury had been diagnosed, and he brought his claim within the two year period required by statute.
Loud v. Dixie Metal Co., supra, is more helpful in our analysis. Loud injured his back at work and was treated by the company doctor in February 1982. He improved somewhat and was able to perform his regular duties until the plant closed in March 1982. He then worked sporadically, despite nagging pain. By December, however, the pain had worsened; Loud's doctor ran tests which revealed "nerve root irritation."
Defendants assert that Loud holds that the date of diagnosis is synonymous with the date the injury "develops." The case does not state this general proposition. Instead, we relied on Mottet, supra, which held that an injury develops when the worker can no longer pursue his trade; thus Loud's injury developed when he was "substantially unable to perform the duties *890 of his employment." Loud, supra, at 125. The date of diagnosis was only one factor in determining the date of disability; it was helpful in that case because the record did not clearly indicate exactly when Loud could no longer work at his trade.
The instant record is unambiguous on this issue. Collier's condition worsened to the point he was no longer able to work as a carpenter in April 1989, when he went to work selling cellular telephones.
In Loud, we noted that as the doctors were unable to "diagnose any specific organic problem" until January 1983, Loud was reasonable in assuming his injury might "eventually go away." Loud, supra, at 125. In the instant case, while Collier knew he had a problem labeled "ulnar nerve entrapment" in the spring of 1988, his doctor advised him that the condition could improve with time and that surgery might be necessary if conservative treatment failed. We do not believe Collier was unreasonable in relying on the possibility of improvement under the conservative care prescribed by his doctor, particularly since he actually continued working as a carpenter for a year after the diagnosis.
In matters of prescription, a layman should not be held to the same standard of vigilance as an attorney. Furthermore, our policy in cases of this type is to encourage rather than penalize an employee who continues working despite what, in legal contemplation, turns out to be disability. Loud, supra, at 125. We thus find that Collier's injury developed within the meaning of the statute when he was forced to discontinue working as a carpenter in April 1989.
On appeal, defendants now argue that even if Collier's injury developed as late as May 1989, there is no record proof that he instituted proceedings with the Office of Workers Compensation within two years of the date of the accident. R.S. 23:1209. Indeed, the record does not contain a copy of the Office's recommendation. However, Collier's petition alleges that the claim was submitted to the office and that attempts at informal resolution failed, and defendants' answer admits these allegations. Moreover, in paragraphs four and five of their exception of prescription, defendants assert that Collier submitted his claim to the office on October 26, 1989, that the office issued a recommendation on November 22, 1989 and that Collier rejected that recommendation effective December 7, 1989. We find that defendants, by their assertions in this pleading, have judicially admitted that Collier submitted his claim to the office within the two year period. See La.C.C. art. 1853. They cannot now argue otherwise. This argument lacks merit.
Finally, defendants argue that Collier failed to show an "inability to earn wages equal to ninety percent or more of his wages at the time of injury." R.S. 23:1221(3). The parties stipulated that no benefits were owed from December 1987 until May 1989. The record also shows that Collier's income exceeded his pre-injury wages beginning in 1990. Defendants contend that no SEB are due Collier for the intervening period because it was not physical disability which prevented him from earning at least 90% of his pre-injury wages, but rather his lack of sales expertise.
The statute authorizes SEB where the employee is "able to earn" less than 90% of his pre-injury wages through
any employment or self-employment, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee at the time of the injury was particularly fitted by reason of education, training, and experience [.]. R.S. 23:1221(3)(a).
The supreme court defined the phrase "wages the employee is able to earn" in the context of partial disability, the precursor to SEB, as
those which the claimant is able to earn at work similar to that which he was performing when injured, not income which he receives from a vocation requiring entirely different efforts. Morgan v. American Bitumuls Co., 217 La. 968, 47 So.2d 739, 741 (1950).
*891 When, as here, the employee must make a transition from a labor-intensive field to one requiring totally different talents, it would defy the policy underlying our compensation laws to deny him the protection of the statute. Under the circumstances of this case, Collier is entitled to recover supplemental earnings benefits for the time he was unable to earn 90% of his pre-injury wages, subject to the parties' stipulation.

CONCLUSION
Because we find that the trial court erred in holding that Collier's injury had developed within the meaning of R.S. 23:1209 by April 1988 or shortly thereafter, we reverse that portion of the judgment sustaining defendants' exception of prescription as to SEB. We remand the case for a determination of the benefits due Collier, as well as whether defendants' action in refusing to pay workers compensation benefits was arbitrary, capricious or without probable cause.
Costs of this appeal are assessed to Southern Builders Inc. and CNA Insurance Co.
REVERSED IN PART AND REMANDED.